FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

97 MAY 13 PM 2:48

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| JERROLL RICHARDSON, | ) | |
| | ) | |
| Plaintiff | ) | CIVIL ACTION NO. |
| | ) | |
| VS. | ) | 92-AR-1588-S |
| | ) | |
| THE CITY OF LEEDS, ALABAMA | ) | |
| | ) | |
| Defendant | ) | |

ENTERED

MAY 13 1997

### MEMORANDUM OPINION

The Eleventh Circuit's opinion in *Richardson v. Leeds Police Department*, 71 F.2d 801 (11th Cir. 1995), contains the procedural history of the above-entitled case up to the point of the appeal that led to that opinion. Therefore, the court need not give the background there outlined. The Eleventh Circuit remanded the case for a jury trial, limited to answering whether plaintiff, Jerroll Richardson ("Richardson"), who is black, could meet his burden of proving to a jury that he was the victim of racial discrimination by the sole remaining defendant, City of Leeds, Alabama ("City"), by virtue of the Mayor's refusal to rehire Richardson as a police officer after Richardson had resigned that position. The only reason Richardson was entitled to jury trial in the first place was that he invoked 42 U.S.C. §§ 1981 and 1983, as well as Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e, *et seq.*). All

125

three of these statutes provided Richardson avenues for complaining of the same alleged municipal conduct, but Title VII before its 1991 amendment did not entitle him to a jury trial.

After receiving the Eleventh Circuit's mandate on August 6, 1996, this court set the case for jury trial on the sole remaining issue. At the conclusion of Richardson's case-in-chief, the City moved for judgment as a matter of law pursuant to Rule 50, F.R.Civ.P., and the court took that motion under advisement. Until now this court has not ruled on that motion. Before the second trial was concluded, the City moved for a mistrial, and its motion was granted. The case was rescheduled for trial on August 18, 1997.

The opinion of the Eleventh Circuit constitutes the law of the case except to the extent that the opinion has been superseded by intervening Supreme Court precedent. The Eleventh Circuit held that this court's denial of defendant's motion filed pursuant to Rule 50, F.R.Civ.P., at the conclusion of Richardson's case-in-chief at the first trial precluded this court's revisiting, as it did, the issue of whether Richardson had made out a *prima facie* or jury case. The Eleventh Circuit made clear its position on this issue with the following instruction:

> When the trier of fact has before it all the evidence needed to decide the ultimate issue of whether the defendant intentionally discriminated against the plaintiff, the question of whether the plaintiff properly made out a prima facie case "is no longer relevant." (citing *United States Postal Serv. Bd. of Governors v.*

*Aikens,* 460 U.S. 711, 103 S. Ct. 1478 (1983)).

*Id.* at p. 806.

There is another instructive holding by the Eleventh Circuit in *Richardson*. It is this:

> In a case such as this alleging disparate treatment, in which section 1983 is employed as a remedy for the same conduct attacked under Title VII, "'the elements of the two causes of action are the same'" *Cross v. State of Ala.*, 49 F.3d 1490, 1508 (11th Cir. 1995) (quoting *Harris v. Stynchcomb*, 691 F.2d 1364, 1369 n. 16 (11th Cir. 1982). In both instances, the plaintiff must prove that the defendant acted with discriminatory intent. *Hardin*, 691 F.2d at 1369 n. 16.

*Id.* at p. 805. The same is true of the § 1981 vehicle, which is duplicative of § 1983. From the beginning of the case, both the Eleventh Circuit and this court assumed that Richardson's approach to liability against the City under §§ 1983 and 1981 and his approach under Title VII were identical, and that if he obtained a favorable answer from the jury under §§ 1983 and/or 1981, this court would be bound to follow the jury finding in the parallel Title VII invocation. As will hereinafter be demonstrated, this assumption is no longer valid.

Both this court and the Eleventh Circuit have also assumed that the City's Mayor, who made the decision not to rehire Richardson, following the recommendation of his Chief of Police, was the designated and binding decision-maker for the City in this instance and thus that it was the Mayor's motivation that was being sought. When the case was first tried, this theory of liability

3

provided Richardson the way around *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 98 S. Ct. 2018 (1978), because of the exception recognized in *Pembaur v. Cincinnati*, 475 U.S. 469, 106 S. Ct. 1292 (1986). The Mayor <u>was</u>, for all intents and purposes, <u>the City</u> within the framework of *Monell* and *Pembaur,* as those cases were understood by this court and by the Eleventh Circuit when Richardson's case was filed, when it was first tried, and when it was considered by the Eleventh Circuit on appeal.

This court is now faced with a dilemma created by a new decision of the Supreme Court of the United States in a case decided on April 28, 1997, namely, *Board of County Commissioners of Bryan County, Okla. v. Brown*, No. 95-1100, __ U.S. __, __ S. Ct.__, 65 USLW 4286 (1997). In this new case, the Supreme Court recognizes a crucial distinction between Title VII and § 1983, two statutes that equally apply to claims of racial discrimination in a hiring decision by a municipal employer. Neither plaintiff nor defendant has brought *Board of Commissioners* to the attention of this court, but this court has either the good or the bad habit of reading Supreme Court advance sheets. *Board of Commissioners* is not only significant for what it holds but because law announced by the Supreme Court is presumed to have retroactive effect unless the Supreme Court expressly indicates to the contrary.

Proof that law central to Richardson's case changed materially when *Board of Commissioners* was decided on April 28, 1997, is found

4

in the criticisms of the majority opinion expressed by the four dissenters. This court is bound, however, by the <u>majority</u> opinion written by Justice O'Connor. Although lengthy, Justice O'Connor's opinion, at least in pertinent part, needs to be set out in order for the reader to understand why *Board of Commissioners* controls Richardson's case and interferes with, or interrupts, the earlier mandate of the Eleventh Circuit in this case. Justice O'Connor, speaking for the majority, said:

> We conclude that the Court of Appeals' decision cannot be squared with our recognition that, in enacting § 1983, Congress did not intend to impose liability on a municipality unless *deliberate* action attributable to the municipality itself is the "moving force" behind the plaintiff's deprivation of federal rights. *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 694 (1984).
>
> \* \* \*
>
> Counsel for Bryan County stipulated that Sheriff Moore "was the policy maker for Bryan County regarding the Sheriff's Department." *Id.*, at 30. At the close of respondent's case and again at the close of all of the evidence, Bryan County moved for judgment as a matter of law. As to respondent's claim that Sheriff Moore's decision to hire Burns triggered municipal liability, the county argued that a single hiring decision by a municipal policymaker could not give rise to municipal liability under §1983. *Id.*, at 59-60. The District Court denied the county's motions. The court also overruled the county's objections to jury instructions on the §1983 claim against the county. *Id.* at 125-126, 132.
>
> \* \* \*
>
> We held in *Monell v. New York City Dept. of Social Servs.*, 436 U.S., at 689, that municipalities and other local governmental bodies are "persons" within the meaning of §1983. We also recognized that a municipality may not be held liable under §1983 solely because it employs a tortfeasor. Our conclusion rested partly on the language of §1983 itself. In light of the statute's imposition of liability on one who "subjects [a person], or causes [that person] to be subjected," to a deprivation of federal rights, we concluded that it

5

"cannot be easily read to impose liability vicariously on governing bodies solely on the basis of the existence of an employer-employee relationship with a tortfeasor." *Id.*, at 692. Our conclusion also rested upon the statute's legislative history. As stated in *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986), "while Congress never questioned its power to impose civil liability on municipalities for their *own* illegal acts, Congress did doubt its constitutional power to impose such liability in order to oblige municipalities to control the conduct of *others*" (citing *Monell, supra*, at 665-683). We have consistently refused to hold municipalities liable under a theory of *respondeat superior*. See *Oklahoma City v. Tuttle*, 471 U.S. 808, 818 (1985) (plurality opinion); *id.*, at 828 (opinion of Brennan, J.); *Pembaur, supra*, at 478-479; *St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988) (plurality opinion); *id.*, at 137 (opinion of Brennan, J.); *Canton v. Harris*, 489 U.S. 378, 392 (1988).

Instead, in *Monell* and subsequent cases, we have required a plaintiff seeking to impose liability on a municipality under §1983 to identify a municipal "policy" or "custom" that caused the plaintiff's injury. See *Monell, supra,* at 694; *Pembaur, supra*, at 480-481; *Canton, supra*, at 389. Locating a "policy" ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality. *Monell, supra*, at 694. Similarly, an act performed pursuant to a "custom" that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law. 436 U.S., at 690-691 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 167-168 (1970)).

The parties join issue on whether, under *Monell* and subsequent cases, a single hiring decision by a county sheriff can be a "policy" that triggers municipal liability. Relying on our decision in *Pembaur*, respondent claims that a single act by a decisionmaker with final authority in the relevant area constitutes a "policy" attributable to the municipality itself. So long as a §1983 plaintiff identifies a decision properly attributable to the municipality, respondent argues, there is no risk of imposing *respondeat superior* liability. Whether that decision was intended to govern only the situation at hand or to serve as a rule to be applied over time is immaterial. Rather, under respondent's theory, identification of an act of a proper municipal decisionmaker is all that is required to ensure that the municipality is held liable only for its own conduct. The Court of Appeals accepted respondent's approach.

6

As our §1983 municipal liability jurisprudence illustrates, however, it is not enough for a §1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the "moving force" behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

Where a plaintiff claims that a particular municipal action *itself* violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward. Section 1983 itself "contains no state-of-mind requirement independent of that necessary to state a violation" of the underlying federal right. *Daniels v. Williams*, 474 U.S. 327, 330 (1986). In any §1983 suit, however, the plaintiff must establish the state of mind required to prove the underlying violation. Accordingly, proof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably. Similarly, the conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains.

Sheriff Moore's hiring decision was itself legal, and Sheriff Moore did not authorize Burns to use excessive force. Respondent's claim, rather, is that a single facially lawful hiring decision can launch a series of events that ultimately cause a violation of federal rights. Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee. See *Canton*, 489 U.S., at 391-392; *Tuttle, supra*, at 824 (plurality opinion). See also *Springfield v. Kibbe*, 480 U.S. 257, 270-271 (1987) (dissent from dismissal of writ as improvidently granted).

In relying heavily on *Pembaur*, respondent blurs the distinction between §1983 cases that present no difficult questions of fault and causation and those that do. To the extent that we have recognized a cause of action under §1983 based on a single decision attributable to a municipality, we have done so only where the evidence that the municipality had acted and that the plaintiff had suffered a deprivation of federal rights also proved fault and

7

causation. For example, *Owen v. Independence*, 445 U.S. 622 (1980), and *Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981), involved formal decisions of municipal legislative bodies. In *Owen*, the city council allegedly censured and discharged an employee without a hearing. 445 U.S., at 627-629, 633, and n. 13. In *Fact Concerts*, the city council canceled a license permitting a concert following a dispute over the performance's content. 453 U.S., at 252. Neither decision reflected implementation of a generally applicable rule. But we did not question that each decision, duly promulgated by city lawmakers, could trigger municipal liability if the decision itself were found to be unconstitutional. Because fault and causation were obvious in each case, proof that the municipality's decision was unconstitutional would suffice to establish that the municipality itself was liable for the plaintiff's constitutional injury.

Similarly, *Pembaur v. Cincinnati* concerned a decision by a county prosecutor, acting as the county's final decisionmaker, 475 U.S., at 485, to direct county deputies to forcibly enter petitioner's place of business to serve *capiases* upon third parties. Relying on *Owen* and *Newport*, we concluded that a final decisionmaker's adoption of a course of action "tailored to a particular situation and not intended to control decisions in later situations" may, in some circumstances, give rise to municipal liability under §1983. 475 U.S., at 481. In *Pembaur*, it was not disputed that the prosecutor had specifically directed the action resulting in the deprivation of petitioner's rights. The conclusion that the decision was that of a final municipal decisionmaker and was therefore properly attributable to the municipality established municipal liability. No questions of fault or causation arose.

Claims not involving an allegation that the municipal action itself violated federal law, or directed or authorized the deprivation of federal rights, present much more difficult problems of proof. That a plaintiff has suffered a deprivation of federal rights at the hands of a municipal employee will not alone permit an inference of municipal culpability and causation; the plaintiff will simply have shown that the *employee* acted culpably.

\*   \*   \*

Before trial, counsel for Bryan County stipulated that Sheriff Moore "was the policy maker for Bryan County regarding the Sheriff's Department." App. 30. Indeed, the county sought to avoid liability by claiming that its Board of Commissioners participated in no policy decisions regarding the conduct and operation of the office

8

> of the Bryan County Sheriff. *Id.*, at 32. Accepting the county's representations below, then, the case presents no difficult questions concerning whether Sheriff Moore has final authority to act for the municipality in hiring matters. Cf. *Jett v. Dallas Independent School Dist.*, 491 U.S. 701 (1989); *St. Louis v. Praprotnik*, 485 U.S. 112 (1988). Respondent does not claim that she can identify any pattern of injuries linked to Sheriff Moore's hiring practices.
>
> \*   \*   \*
>
> Cases involving constitutional injuries allegedly traceable to an ill-considered hiring decision pose the greatest risk that a municipality will be held liable for an injury that it did not cause. In the broadest sense, every injury is traceable to a hiring decision. Where a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into *respondeat superior* liability. As we recognized in *Monell* and have repeatedly reaffirmed, Congress did not intend municipalities to be held liable unless *deliberate* action attributable to the municipality directly caused a deprivation of federal rights. A failure to apply stringent culpability and causation requirements raises serious federalism concerns, in that it risks constitutionalizing particular hiring requirements that States have themselves elected not to impose. Cf. *Canton v. Harris*, 489 U.S., at 392. Bryan County is not liable for Sheriff Moore's isolated decision to hire Burns ....

Richardson's §§ 1983 and 1981 case depends entirely on attributing to the City the single act of the Mayor in refusing to rehire him. In charging the first jury (the jury that was unable to reach a verdict with respect to the instruction for the hiring decision) this court instructed the jury that the determination of the <u>Mayor's</u> motivation in deciding whether to rehire Richardson was the jury's responsibility for answering the first jury interrogatory. There was no inquiry or instruction with regard to a pervasive municipal policy, express or implied, such as one expressed by a City Council, that may have been manifested in the

9

Mayor's decision. Such was never Richardson's contention. Highly significant is the fact that the jury <u>did</u> provide answers to two indirectly relevant questions. It answered "NO" to the following question:

> Did Jerroll Richardson prove by a preponderance of the evidence that his race was a motivating factor in the decision by Thomas McDonald [the Police Chief] to recommend to the Mayor that Richardson not be rehired by the City of Leeds?

It also answered "NO" to the following question:

> Did Jerroll Richardson prove by a preponderance of the evidence that pursuant to any policy, custom or practice of the City of Leeds, it harassed or <u>otherwise disparately treated Richardson because of his race on any occasion after July 13, 1990</u>?

(emphasis supplied).

These answers assisted both this court and the Eleventh Circuit to narrow the focus to the only question that the jury could not manage, namely:

> Did Jerroll Richardson prove by a preponderance of the evidence that his race was a motivating factor in the decision <u>by the City of Leeds</u> not to rehire him?

(emphasis supplied). In view of this court's understanding of *Pembaur*, as that understanding was articulated to the first jury, the above question could, and perhaps should, have read:

> Did Jerroll Richardson prove by a preponderance of the evidence that his race was a motivating factor in the decision <u>by the Mayor</u> not to rehire him?

(emphasis supplied). Under the lesson of *Board of Commissioners*, without substantial proof upon which a reasonable jury could have found "deliberate action attributable to the municipality," and

10

because, to the contrary, the jury actually and correctly found that the City, as an institution, had no custom, practice or policy that caused disparate treatment of Richardson, Richardson's case under §§ 1983 and 1981 must now fail. No person can read Justice O'Connor to have said what the dissenters would have preferred her to have said. The majority in *Board of Commissioners* definitely intended drastically to narrow the *Pembaur* opening, Richardson's only avenue to liability against the City. This court is compelled *sua sponte* either to revisit the City's hoary Rule 50 motion in the first case despite the Eleventh Circuit's holding, or to rule on the City's more recent Rule 50 motion not yet ruled on. This obligation is placed on this court by the Supreme Court. It cannot be ignored. Applying *Board of Commissioners*, this court concludes that the City's Rule 50 motion, whether the one filed at the first trial or the one filed at the second trial, is due to be granted as to Richardson's §§ 1983 and 1981 claims. This court's earlier rationale in erroneously granting the City's Rule 50 motion on March 15, 1994, was appropriately rejected by the Eleventh Circuit under the law as it then stood. This court certainly has no quarrel with the Eleventh Circuit. Likewise, it wants no quarrel with the Supreme Court.

Because the non-jury Title VII claim is no longer controlled by the §§ 1983/1981 result, inasmuch as a municipality can be liable under Title VII under a *respondeat superior* theory, this

11

court, without reference to the narrowing of the way to liability against a municipality under §§ 1983 and 1981, as articulated in *Board of Commissioners*, must make its own findings of facts and must reach its own conclusions of law with respect to Richardson's Title VII claim, something it was not called upon to do earlier. The court's memory of the evidence is refreshed by its memorandum opinion of March 15, 1994, but virtually the same evidence was offered during the recent mistrial.

### Findings of Fact

Richardson resigned his job as a patrolman with the City saying he was "burned out." No other City police officer had ever before given such a reason for quitting the police force. When Richardson thereafter changed his mind and applied for rehire, his Police Chief (who was expressly found by the first jury not to have been motivated by Richardson's race when recommending to the Mayor that Richardson not be rehired) was a reasonable and presumptively reliable source for the Mayor when he made his decision. Already having his eye on another black patrolman prospect, who was a resident of the City (something Richardson was not), the Mayor followed the Chief's recommendation, refused to rehire Richardson, and instead, hired the alternative black applicant for the vacancy. The dual legitimate non-discriminatory reasons articulated for not rehiring Richardson were, based on this court's evaluation of the evidence, not pretextual, and the Mayor was not motivated by

12

Richardson's race any more than the Chief was. This court had an opportunity to evaluate the demeanor of the witnesses. While Richardson was allowed to voice the personal belief that his race was a factor in the Mayor's decision, the court finds that this conclusory opinion is more than offset by more credible evidence from the City that the Mayor had no racially discriminatory intent. The absence of proof of any pervasive practice or custom of invidious racial decision-making by the City adds weight to the City's position. Richardson put all his eggs in the *Pembaur* basket, a basket that leaked badly on April 28, 1997.

### Conclusions of Law

The court, as is reflected in the pre-trial order, has jurisdiction of the subject matter and of the parties.

Richardson failed to meet his burden of proving racial discrimination by the City in violation of Title VII by virtue of the Mayor's decision not to rehire him.

If it is assumed *arguendo* that Richardson made out a *prima facie* case, the City's articulated reasons for not rehiring Richardson are overwhelmingly persuasive and not pretextual. In particular, the court agrees that a police officer who has resigned, saying that he is "burned out" is not a prime candidate for being rehired, especially when he is competing with another applicant of the same race and who is not "burned out." The court cannot know how many of the original jurors were unable to find

that Richardson had proven by a preponderance of the evidence that the Mayor was motivated by Richardson's race. Whether that number was the majority or the minority of the jury, this court agrees with those jurors who found that Richardson had failed to meet his burden of proof on this dispositive question.

An appropriate, separate order will be entered, granting the City's Rule 50 motion as to the §§ 1983 and 1981 claims and dismissing the claim under Title VII.

DONE this 13th day of May, 1997.

/s/ William M. Acker
WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE